## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| Christopher G. Windham and | ) | |
| Jule R. Windham, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 04-1247-WEB |
| | ) | |
| Circuit City Stores, Inc., | ) | |
| Pacific Electricord Company and | ) | |
| Leviton Manufacturing Company | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |

### MEMORANDUM AND ORDER

Now before the Court are Defendant Circuit City's (Defendant) motion to exclude testimony of

Plaintiff's expert witness and for summary judgment and Plaintiffs' motion in limine.  (Docs. 45, 46).

Plaintiff alleges Defendant negligently installed a range cordset which caused a fire resulting in $87,650.42

in damages.  The Court has jurisdiction over this case under 28 U.S.C. § 1332.  Plaintiffs and Defendant

argue that the other side's expert witness testimony does not meet the standards set out in Rule 702 and

*Daubert*.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); Fed. R. Evid. 702.

Defendant further argues that if Plaintiffs' expert testimony is excluded there would be no evidence showing

causation; hence, summary judgment would be warranted.

### I.  Facts

1.  Plaintiffs purchased from Circuit City a range and range cordset which was installed by Circuit

City personnel at Plaintiffs' residence in January 1999.  Neither of the Plaintiffs noticed anything unusual about the installation which involved nothing more than hooking up the cordset to the range, plugging the range cordset into a pre-existing outlet located on the floor in Plaintiffs' residence, and pushing the range back into the range cove located in Plaintiffs' kitchen.  There is no evidence that Circuit City's representatives forced or otherwise had to struggle to install the range and range cordset at the Plaintiffs' residence.

2.  The oven portion of the range was used very seldom.

3.  A fire occurred at Plaintiffs' residence on August 2, 2002 causing damage to Plaintiffs' residence and their belongings.  The deepest and lowest char in the fire was in the kitchen floor area.  (Pl. Ex. 2 at 30: 8-13).

4.  The range, as installed at Plaintiffs' residence, sat approximately 4-6 inches away from the back wall in the range cove of Plaintiffs' kitchen due to a pre-existing capped gas line which prevented the range from being pushed flush with the rear wall.  From the time the range was installed until the fire, the space between the rear of the range cove wall and the range was swept clean of dog food, dust and other debris on a weekly basis.  (Doc. 47, Ex. B at 64: 2-16).

5.  Plaintiffs' insurance carrier retained the services of James Martin to investigate the fire and determine the fire's cause.  Martin is a licensed professional engineer and has a degree in electrical engineering.  Martin has been involved in forensic firework for twenty years.

6.  Martin investigated the accident scene and wrote a report which concluded that the "range's cordset experienced an arcing fault at the lower corner of the range.  I believe this arcing was the root cause of the fire incident."  (Id. Ex. C at 1-2).  Martin further stated, "I believe it is most probable the

cordset was defective and/or damaged when it and the range were originally installed.  This means the cordset was defective when it was originally installed or it was damaged when the range was originally placed in its in-use location.  No other scenario fits the evidence observed." (Id. at 2).  In his deposition Martin stated "[i]f the cordset had not been placed in a position where it could be abraded by the screw head on the back of the range, I think this fire most probably would not have occurred..." (Pl. Ex. 1 at 17: 5-8).

7.  Martin has not conducted any tests or experiments showing whether a screw head similar to that which was found on the range could work its way through standard range cord insulation.  (Doc. 47, Ex. D at 36: 15-21).  Martin has not performed any tests to determine if the location of the range cord head and the floor outlet would block the screw from contacting the range cord.  (Id. at 67: 7-12).

8.  Martin considered other points of origin for the fire.  He stated that there was no correlation between Plaintiffs' smoking habits and the fire incident because he saw electrical involvement and the damage did not appear to be caused by a smoking fire.  (Pl. Ex. 1 at 8: 11-17).  Martin stated that the results of his report considered the possibility of the trash can catching fire first and causing the cordset to arc as a victim of the fire.  (Id. at 41:18 to 42:5).

He considered the top of the stove but concluded that the damage to the bottom of the range was not consistent with this scenario.  He stated, "[f]ires typically burn up and out, not down.  One of the key things we look at is the lowest point of damage or burn.  It's true that you can have something fall that's on fire, combusting, and create a lower burn than the initial initiation of the fire location, I didn't see evidence of that here." (Id. at 38: 4-21).  He also stated the lack of any left over burned debris on the range top was evidence that it did not start on top of the range.  (Doc. 47, Ex. D at 47: 2-4).

Martin did not see evidence showing the control console as a point of origin. "I was particularly interested to see if the fire may have somehow originated with an electrical fault in the control console, presenting excessive fault currents to the cordset, which in turn caused it to fail from being overheated. None of that occurred." (Id. at 49: 1-10).

Martin stated that there was no evidence showing the laundry dryer, receptacle to which the range was connected, or the circuit conductor supplying that receptacle were instrumental in causing the fire. He also stated that the physical evidence and damage at the fire scene showed that the fire did not begin under the floor. (Id. at 50: 13-17). Martin also ruled out the natural gas line as a potential source of the fire as it had been capped off. (Id. at 52: 14-16).

9. Martin stated that the insulation from the cordset as an initial fuel source would have been insufficient to sustain the fire and a secondary fuel source would have been necessary. (Pl. Ex. 1 at 57: 1-14). A paper towel or piece of cloth would have been sufficient as a secondary fuel source; however, there was no direct evidence of a secondary fuel source. (Id. at 56:17 to 57: 14). The linoleum could not have been a secondary fuel source, even with burning insulation dripping on it. (Id. at 71: 10-14).

10. Defendant's expert, John Branch, is a licensed professional engineer with extensive experience in fire investigations, especially those involving appliances. (Doc. 48, Ex. C ¶ 3); (Id. Ex. D). Branch has conducted measurements with respect to the cord, the outlet and the range. (Doc 47, Ex. E at 41: 9 to 42: 10). He has determined that the screw head could not have made sufficient contact with the range cord insulation to cause arcing fault. (Id. at 42: 12-17).

11. Branch conducted a test to show the durability of a cordset. (Doc. 48, Ex. A). He pushed a cordset against a screwhead on the back of an exemplar range. Branch measured the backs of the

exemplar range and the subject range and his measurements showed the two ranges to be the same. (Doc. 48, Ex. B at 63: 2-3). Branch compared screwheads on the frame of the subject range and those on the exemplar range and found them to be nearly identical. (Id. at 63: 4 to 64: 8). Branch observed the thickness and composition of the actual range cordset involved in the fire and obtained a similar cordset that is nearly identical in insulation thickness and composition. (Id. Ex. C ¶ 4). Defendant proffers this test not as an attempt to re-create the conditions at the time of the fire; rather, to illustrate the durability of a similar cordset. (Id. Ex. B at 66: 22 to 67: 1); (Id. Ex C ¶ 5).

12. After the fire, the oven control knob was found in the WM position. (Id. Ex. D at 10). The oven vents through the right rear burner element bowl on the range. (Doc. 47, Ex. D at 47: 15-18). Branch stated that burn patters on the range indicate the top of the range as the point of origin for the fire. (Doc. 48, Ex. D at 5).

13. Branch performed another test to show the temperature of the range with the oven controller set in the WM position. The frame, oven size, heating element, and controller in the exemplar range are essentially identical to those on the subject range. (Doc. 48, Ex. B at 48:10 to 49: 1, 53: 16 to 54: 12). The exemplar range is a used range and Branch does not know the history of use of either the exemplar or the subject range. (Id. at 54: 13-25). Branch admits that the history of usage can have a small impact on the temperature variations of the individual ranges. (Id.).

Branch set the exemplar control knob to WM and recorded temperatures for the oven vent between 180 to 250 degrees Fahrenheit. (Id. Ex. D at 4). Branch explained that the temperature indicated on the oven control dial may not reflect the actual temperature at the oven vent. (Id. Ex. B at 52: 7-11). The oven temperature control runs off of a thermostat, so it will heat up to a certain degree and once it

reaches that upper limit temperature, it cools down to a lower limit and then it heats back up again.  (Id. Ex. B at 49: 25 to 50: 8).  Branch used this repeated heating and cooling cycle to explain the variation of 70 degrees Fahrenheit in his measurements.  (Id. at 50: 9-15).  Branch placed towels over the oven vent and combustion did not occur.  (Id. at 57: 16-25).  Defendant proffers this test to simulate the temperature of the oven vent at the time of the fire.  (Id. at 48: 2-3).

14.  Defendant proffers an article in an engineering magazine showing that spontaneous combustion of oil laden fabrics is possible.  (Id. Ex. E).

15.  N.F.P.A. 921 is the industry standard guide for fire investigation.  (Doc. 47, Ex. D at 67: 13-18).  This guide employs the scientific method for investigating fires; that is the systematic pursuit of knowledge in an effort to determine a cause of a fire.  (Id. at 68: 3-13).

## II.  Governing Law

Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Rule 702 requires a court to act as a gatekeeper for proposed expert testimony.  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).  The rule directs the trial court to assess, first whether a proposed expert is qualified by "knowledge, skill, experience, training, or education" to

render an opinion.  *Id.*  If the expert is qualified, the court must determine whether the expert's opinions are reliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *Ralston*, 275 F.3d at 969.

The *Daubert* Court outlined four factors appropriate for consideration in assessing the admissibility of expert testimony: (1) whether a theory has been or can be tested or falsified; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there are known or potential rates of error with regard to specific techniques; and (4) whether the theory or approach has general acceptance. *Daubert,* 509 U.S. at 593-594.  "*Daubert* makes clear that the factors it mentions do not constitute a definitive checklist or test."  *Kumho tire Co. Ltd., v. Carmichael*, 526 U.S. 137, 150 (1999).

> The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is "generally accepted" in the scientific community.  Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements.

*Mitchell v. Gencorp. Inc.,* 165 F.3d 778, 781 (10th Cir. 1999) (citations omitted).

The Court should generally focus on the expert's methodology rather than the expert's conclusions, but the conclusions must be connected to the existing data by more than the *ipse dixit* of the expert. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003).

Under Rule 702, the Court must also determine whether the proffered evidence would succor the trier of fact to understand the evidence or determine a fact in issue.  *Biocore, Inc. v. Khosrowshahi*, 183 F.R.D. 695, 699 (D. Kan. 1999).  "Specific subject areas of proposed expert testimony must therefore be examined to ascertain whether each is sufficiently tied to the facts of the particular case that they will be helpful to the trier of fact.  *Id.*  Any doubts should be resolved in favor of admissibility.  *Id.*

"[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702 (Advisory Committee Notes for 2000 Amendments); *see Bourjaily v. United States,* 483, U.S. 171 (1987); *see Daubert*, 509 U.S. at 592 n.10.


### III.  Defendant's arguments

Defendant argues that Martin did not use the scientific method to properly eliminate other causes of the fire, specifically, that Plaintiffs were smokers and there was a trash can next to the range.

The Court disagrees. Martin's testimony shows that he did eliminate alternative causes of the fire and this has been recognized as a legitimate method of establishing causation. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1238 (10th Cir. 2004). "An inference to the best explanation for the cause of the accident must eliminate other possible sources as highly improbable, and must demonstrate that the cause identified is highly probable." *Id.* However, an expert need not definitively exclude every possible alternative to testify on causation. *Id.* n6.

Martin reasoned to the best inference of the cause of the explosion by eliminating other possible causes as improbable. Martin specifically stated that the evidence was not consistent with a smoking fire. Martin also gave specific reasons for eliminating other possible sources of the fire including the range top, oven, control console, gas line and the dryer. He also stated that he factored in the trash can as a possible source of the fire; however, he did not explain why he ruled out the trash can as a possible source of the fire. Failure to adequately explain this one alternative cause of fire does not render Martin's analysis

completely unreliable. *Cf. Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) (a medical expert's opinion should not be excluded for failing to rule out every possible alternative cause of an illness; rather, this should affect the weight given to the opinion).  The reasons given for eliminating other causes of the fire are sufficient to establish reliability under *Daubert*; furthermore, the failure to provide sufficient reasoning with respect to the trash can as a source of the fire goes to the weight of his testimony to be decided by the trier of fact.

Defendant next argues that Martin's conclusions are unreliable because he did not conduct any tests.  Testing is not the determinative factor.  "Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of independent testing may "go to the weight, not the admissibility" of the testimony." *McCoy v. Whirlpool Corp.*, 379 F. Supp. 2d 1187, 1197 (D. Kan. 2005) (citing *Zuchowicz v. United States*, 140 F.3d 381, 387 (2d Cir. 1998).

Martin employed physical investigation, professional experience and technical knowledge to determine causation.  Martin concluded that negligent installation caused a screw on the rear of the range to abrade the cordset thereby initiating a fire.  This conclusion has its basis in the facts.  First, Martin found the footprints of the range after the fire.  He was then able to determine the location of the outlet relative to the rear edge of the range.  From the position of the cordset, receptacle and the range, Martin concluded that the way the cordset was plugged into the receptacle placed the cordset in a position to be abraded by the screw on the range.  This methodology involves a sufficiently reliable method that would aid the jury in resolving a factual dispute.  *See Bitler,* 400 F.3d at 1235 (although not susceptible to testing or peer review, observation of the physical evidence at the accident scene to deduce causation does constitute generally acceptable practice as a method for fire investigators).

9

Defendant next argues that Martin's conclusions are unsupportable because they involve different inferences from the same types of facts. Martin observed no unburned debris either on top of the range or on the floor behind the range. Consequently, Martin concluded that the range top did not begin the fire because there was no evidence of unburned material. Conversely, Martin concluded that a fire was sustained by material behind the range despite a similar lack of evidence of unburned material.

Martin gave other reasons for eliminating the top of the range as a point of origin for the fire. He stated things tend to burn out and up not down. The lowest point of burn was the kitchen floor and there was no evidence of something burning and falling to the ground. Martin's findings that the fire did not begin on the range top is supportable on these observations. The inconsistencies in his reasoning based on the absence of unburned material goes to the weight to be assigned Martin's testimony by the trier of fact.

Defendant finally argues that Martin's conclusion is unsupportable because he stated secondary material would have been necessary to sustain a fire on the floor behind the range; yet, there is no evidence of secondary source material existing in that location. Defendant cites Plaintiffs' testimony that they cleaned weekly behind the range as evidence that there was no secondary source material. The Court disagrees. Plaintiffs' need to clean weekly does not stand for the proposition that there was never any material that could act as a secondary source for a fire; rather, it shows that materials indeed found their way behind the range. Plaintiff stated her two dogs would frequently bring in dust after coming in the back door and that dog food was found on a weekly basis behind the range. Whether there was something behind the range that could have acted as a secondary source at the time of the fire, despite Plaintiffs' cleaning habits, is a question of fact for the jury.

The Court finds that Plaintiffs have shown Martin's testimony to be sufficiently reliable. The Court

10

also finds that the testimony is sufficiently relevant as it will assist the trier of fact in determining the cause of the fire.

IV.  Plaintiffs' Motion in Limine

Plaintiff seeks to exclude evidence of two tests conducted by Defendant's expert.  The law distinguishes between tests which simulate the actual event and those which merely illustrate mechanical principles.

> Experiments purporting to simulate actual events may be admissible if made under conditions which are substantially similar to those which are the subject of the litigation.  While the conditions need not be identical, they must be sufficiently similar to provide a fair comparison...On the other hand, filmed evidence which is not meant to depict the actual event may be admitted to show mechanical principles, upon a showing that the experiment [was] conducted under conditions that were at least similar to those which existed at the time of the accident...Experiments used to simply demonstrate the principles used in forming expert opinion need not strictly adhere to the facts.  It is important then that the jury be instructed that the evidence is admitted for a limited purpose only.

*Four Corners Helicopters, Inc. v. Turbomeca, S.A.,* 979 F.2d 1434, 1442 (10th Cir. 1992) (internal quotations and citations omitted).

Plaintiffs want to exclude evidence of a videotaped test where Branch pushes a cordset against a screw on a range.  Plaintiffs argue the test was not similar to actual conditions because: Branch did not use the same cordset as the one involved in the fire; the position of the range relative to the room was different; and the cordset involved was behind the range for 3 and a half years whereas Branch's test lasted only a few seconds.  Defendant responds that this test is proffered to show the physical characteristics of the cordset and not as an attempt to re-create the conditions which existed at the time of the fire; therefore, the test meets the standard for being similar to actual conditions.

11

The Court agrees that Defendant's test is similar enough to those conditions existing at the time of the fire.  First, Branch took measurements and found that the insulation composition and thickness of the exemplar cordset were substantially similar to the subject cordset.   The law requires similarity of circumstances not identical circumstances and the exemplar cordset is sufficiently similar to the subject cordset.

The facts that Branch did not locate the exemplar range in the same place in a room as the subject range or test the cordset for as long as the subject cordset was used does not make this test so dissimilar that it should be excluded.   Defendant has not proffered this test in an attempt to re-create the conditions at the time of the fire; rather, the test demonstrates the durability of the cordset in an attempt to show Plaintiffs theory of causation is unlikely.  Plaintiffs are still free to cross-examine Branch to highlight the differences between the cordsets, length of use and range location.  *See Daubert,* 509 U.S. at 595 (vigorous cross-examination, presentation of contrary evidence and careful instructions are the traditional and appropriate means of attacking shaky but admissible evidence); *Four Corners*, 979 F.2d at 1442 (typically dissimilarities of experimental evidence goes to weight of evidence rather than admissibility).

The Defendant measured or observed the exemplar range, cordset and range screwheads and testified that they are either the same or nearly identical.  These similarities are sufficient for this test to be admissible.

Plaintiffs also argue that even if this test were admissible, it would create unfair prejudice to Plaintiffs' case and mislead the jury.  Fed. R. Evid. 403.  Rule 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by danger or unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.

Id.

"In weighing the factors under Rule 403, the court should generally give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *SEC v. Peters*, 978 F.2d 1162, 1171 (10th Cir. 1992) (quotations and citation omitted).

First, the Court notes Branch's test on the cordset is highly probative as it makes Plaintiffs' theory of causation less likely. The dissimilarities between the test conditions and the conditions at the fire are not so great as to substantially outweigh the test's probative value. Moreover, any unfair prejudice or danger of the jury being misled can be ameliorated with a limiting instruction.

Plaintiffs next seek to exclude Branch's testimony about the temperature of the range at the time of the fire. Plaintiffs argue that Branch's testimony is based on a test that is unreliable and is so dissimilar with the actual conditions at the fire that it is inadmissible. Plaintiffs point out the following facts: 1) the exemplar and subject ranges had unknown histories; 2) a different control knob was used on the exemplar range; 3) temperatures in the test varied 70 degrees; 4) the knobs are not reliable indicators of temperature; 5) ranges' temperatures vary based upon life experience; and 6) towels placed over the oven vent did not combust. Defendant claims that this test is substantially similar to the actual conditions and should be admissible under *Four Corners*.

Plaintiffs claim that the inherent temperature variation of individual ranges based on unique histories of each range makes the testing of this range different from the actual conditions of the subject range. Branch admitted as much but stated that the temperature differences from range to range based upon different histories was not much. Accounting for Branch's testimony, the preponderance of the evidence shows that the temperature variations are not so wide as to make the test not substantially similar to the

13

actual event.

Plaintiffs state that the control knobs were different; however, they fail to provide any substantive legal analysis.  While the knobs may have been different, Branch states that both ranges had an identical frames and oven elements.  Moreover, he stated that the oven temperature controller in the exemplar range was essentially identical to the subject range.  Plaintiffs fail to argue why the difference between the two knobs on the ranges is anything more than cosmetic.  The Court finds the exemplar range to be substantially similar to the subject range.

Plaintiffs argue that the knobs are not reliable indicators of temperature.  Apparently Plaintiffs believe this makes the experiment unreliable; however, Branch admits as much in his testimony.  Branch stated, "[t]hese controllers just aren't that-aren't designed to be that accurate in this range, that's why I tested one, instead of going off of the reading on the range..." (Doc. 48, Ex. B at 52: 7-10).  The Court disagrees with Plaintiffs' argument that a failure to rely on inaccurate temperatures on the knobs make Branch's independently recorded temperature measurements unreliable.

Plaintiffs next argue that Branch's measurements recorded a temperature variation of 70 degrees Fahrenheit.  Plaintiffs again fail to explain what significance this variation has on the reliability of the test. Branch explains that the temperature variation is a result of the range design.  The oven does not heat the element to a certain temperature and leave it there; rather, there is a constant cycle of heating and cooling using a thermostatic control.  When the oven reaches a certain upper limit temperature it shuts down, which allows for cooling, and then it heats back up again.  Branch stated that this is the way controllers work. Because the controllers in the exemplar and subject ranges are nearly identical, the Court finds by a preponderance of the evidence that the temperature variation in the exemplar range was substantially similar

14

to that on the subject range.  Moreover, Branch's explanation of the temperature variation is reliable under the *Daubert* factors as it is something whose veracity can be tested.

Finally, Plaintiffs argue the towels placed on top of the range did not combust.  Other than citing to cases, Plaintiffs again provide no legal analysis.  The Court disagrees that this fact makes Defendant's experiment unreliable or not sufficiently similar.  Defendant's testimony on causation is not an *ipse dixit* because it has a basis in existing facts.  Branch stated in his report that the burn patterns on the range indicate the top of the range was the point of origin for the fire.  The oven control knob on the subject range was found in the WM position and the oven vent is located through the rear right burner on the range.  Branch's test shows the temperatures of an oven vent when the oven is in the WM position.  Consistent with this theory, Defendant produced a report showing that certain fabrics can spontaneously combust.  *See Daubert,* 509 U.S. at 594 (publication in a journal is a relevant consideration in assessing the scientific validity on which an expert opinion is premised).  While there is no direct evidence that an oil laden towel combusted as a result of the heated oven vent, the above circumstantial evidence provides a sufficient basis for Branch's testimony that the fire began on top of the range.  *See Minerals & Chemicals Philipp Corp. v. S.S. Nat'l Trader*, 445 F.2d 831, 832 (2d Cir. 1971) (by the very nature of a fire, its cause must often be proven through a combination of common sense, circumstantial evidence and expert testimony).

The fact that the towels did not combust is a fact that goes to the weight to be assigned Branch's theory of causation.  However, Defendant's proffered testimony and test are based on sufficient facts and are reliable under *Daubert* and Rule 702.

Plaintiffs also make an unsupported argument that the failure of the towels to combust shows dissimilarity between the test and the actual conditions.  Plaintiffs' argument is curious as it requires the

Court to first accept Branch's theory that towels did combust from the oven heat; therefore, Branch's inability to replicate this in his test shows that it is not substantially similar to what actually happened. The Court need not directly address this question as this memorandum has already held that the conditions used in the test and those in the actual fire are substantially similar. The fact that the towels did not combust does not alter this conclusion; moreover, the Court notes that this fact causes no prejudice to Plaintiffs as it tends to undermine the credibility of Branch's conclusions.


## V.  Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A principal objective of the summary judgment rule is to isolate and dispose of factually unsupported claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).

A fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.*, 259 F.3d 1226, 1234-1232 (10th Cir. 2001) quoting *Adler v. Wal-Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998). "An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler,* 144 F.3d at 670.

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Id.* at 670-671. The movant can do this by demonstrating a lack of evidence on an essential element of the nonmovant's claim. *Id.* at

16

671.  "If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  *Id.* (citing Fed. R. Civ. P. 56(e)).

Defendant's motion for summary judgment was predicated on the exclusion of Martin's testimony showing causation.  Because the Court finds that Martin's testimony is admissible under Rule 702, there remains a genuine issue of material fact on the issue of causation and the motion for summary judgment must be denied.

It is ORDERED that Defendant's Motion to exclude Plaintiffs' expert testimony and for Summary Judgment (Doc.46) be DENIED.

It is further ORDERED that Plaintiffs' Motion in Limine (Doc. 45) be DENIED.

SO ORDERED this  10th  day of March 2006.

 s/ Wesley E. Brown

Wesley E. Brown, U.S. Senior District Judge